DEWEY G. CARTER AND WIFE, GAIL M. CARTER, PLAINTIFFS, V. TD AMERITRADE HOLDING CORPORATION, TD AMERITRADE TRUST COMPANY, FISERV HOLDING COMPANY, FISERV TRUST COMPANY, LINCOLN TRUST COMPANY, NTC & CO., CAPITAL INVESTOR GROUP, INC., WALTER R. REINHARDT, LIFE INSURANCE COMPANY OF THE SOUTHWEST, AND J. EVERETT JOHNSON, DEFENDANTS

No. COA11-254

(Filed 17 January 2012)

**1. Arbitration and Mediation—motion to compel—forged signature on investment document—ratification**

An order denying defendants' motion to compel arbitration was reversed and remanded where plaintiffs sued for investment losses, defendants moved for arbitration, and plaintiffs claimed that their signatures were forged on IRA and investment documents containing the arbitration clause. Reviewing the issue of ratification *de novo*, plaintiffs' conduct was consistent with an intent to affirm the unauthorized act and inconsistent with any other purpose, so that plaintiffs ratified any unauthorized act of the investment advisor as a matter of law.

**2. Arbitration and Mediation—motion to compel—forged signature on investment documents—equitable estoppel**

An order denying defendants' motion to compel arbitration was reversed and remanded where plaintiffs sued for investment losses, defendants moved for arbitration, and plaintiffs claimed that their signatures were forged on IRA and investment documents containing the arbitration clause. Reviewing the issue of equitable estoppel *de novo*, plaintiffs' claims were almost entirely

CARTER v. TD AMERITRADE HOLDING CORP.

[218 N.C. App. 222 (2012)]

phrased in tort, but were dependent on duties arising from the documents that contained the arbitration clause.

Appeal by defendants from order entered 7 December 2010 by Judge Michael R. Morgan in Durham County Superior Court. Heard in the Court of Appeals 10 October 2011.

*McDaniel & Anderson, L.L.P., by L. Bruce McDaniel, for plaintiffs-appellees.*

*Ellis & Winters LLP, by Leslie C. Packer, for defendants-appellants.*

MARTIN, Chief Judge.

Plaintiffs, Dr. Dewey G. Carter and wife, Mrs. Gail M. Carter, filed their complaint in this action asserting various claims for losses they allegedly sustained in connection with certain investments they made beginning in 2001 with defendants Life Insurance Company of the Southwest (LSW), Walter R. Reinhardt and his company, Capital Investor Group, Inc., J. Everett Johnson, Fiserv Holding Company, its affiliate, Fiserv Trust Company, and their operating divisions, including Fiserv Investor Support Services (Fiserv ISS) and Lincoln Trust Company, and NTC & Co. Defendants TD Ameritrade Holding Corporation and its subsidiary, TD Ameritrade Trust Company, are the successors in interest to the Fiserv defendants (collectively, "defendants").

Entries of default were made against defendants Reinhardt, Capital Investor Group, Inc. and Johnson. The Fiserv defendants moved to compel arbitration and stay the litigation pursuant to the Federal Arbitration Act (FAA), 9 U.S.C. § 1, *et seq.*, and § 1-569.7 of North Carolina's Revised Uniform Arbitration Act, contending plaintiffs' contracts with Fiserv ISS contained a mandatory arbitration clause. Specifically, the Fiserv defendants asserted that plaintiffs had each signed a Traditional IRA Application with Stretch Provisions included within Fiserv ISS's standard form Individual Retirement Account (IRA) contract and that the claims in plaintiffs' complaint were within the scope of the arbitration statements in those contracts. In their complaint and in their response to the motion to compel arbitration, plaintiffs asserted that they had never signed private equity investment forms directing their investments in LLCs or the IRA contracts establishing their IRAs and that their signatures were forged on those documents. Defendants replied, in relevant part, that

there was no support for plaintiffs' claim that their signatures were forged on the IRA contracts and, alternatively, plaintiffs were bound by the arbitration statements in the IRA contracts on the basis of (1) equitable estoppel, (2) agency, or (3) ratification.

From the record, it is made to appear that in 2001, plaintiffs entered into a Defined Benefit Plan and Trust with contributions made to and administered by defendant LSW. Plaintiffs allege that in late August 2004, LSW informed them they would need an investment representative in the North Carolina-area and suggested they contact defendant Reinhardt and his company, Capital Investor Group, Inc. According to plaintiffs' allegation, they "went along with the appointment" and in late August 2004, their "assets were held and administered by LSW."

In 2006, plaintiffs' plan was rolled over into self-directed IRAs with the Fiserv defendants. Plaintiffs' signatures appear on Traditional IRA Applications with Stretch Provisions included within Fiserv ISS's standard form IRA contracts establishing their individual IRAs. Directly above the signature line, the contracts state "I . . . specifically acknowledge that I have read, understand and agree to the Arbitration Statement that is part of the Plan Documents . . . ." The "Arbitration Statement" contained within the contracts establishing plaintiffs' IRAs provides the following, in relevant part:

> The Account Owner hereby agrees that all claims and disputes of every type and matter between the Account Owner and Fiserv Trust, including but not limited to claims in contract, tort, common law claims or alleged statutory violations, shall be submitted to binding arbitration pursuant to the rules of the American Arbitration Association; when the total damages by all claimants in an Arbitration Demand exceed $75,000 the proceedings and hearings in the case shall take place only in Denver, Colorado . . . . The Account Owner expressly waives any right he/she may have to institute or conduct litigation or arbitration in any other forum or location, or before any other body, whether individually, representatively or in another capacity. . . .

The investment authorization forms directing plaintiffs' investments in LLCs contain the same "Arbitration Statement."

Plaintiffs filed a motion requesting release of investigation and intelligence information and records from the Securities Division of

the North Carolina Secretary of State, which they contended would show that investment documents in the Securities Division's files either "contain[ed] or appear[ed] to contain forged, transposed, and/or transfixed signatures of the plaintiffs in connection with certain investments which are the subject of this litigation . . . ." Plaintiffs requested, among other things, "copies of those documents in order to properly prepare for trial with the authenticity of such alleged signatures being critical issues."

After a hearing, the trial court denied plaintiffs' motion for release of the records from the North Carolina Secretary of State and denied defendants' motion to compel arbitration, stating it "could rule [on defendants' motion] based upon legal principles." The trial court's order contains the following relevant findings of fact:

> 9. The Fiserv defendants have failed to carry their burden of proof controverting plaintiffs' showing that there was no ratification of contract . . . . Further, plaintiffs received no substantial or significant benefits from the arrangement with the Fiserv defendants in the first place.

> 10. The Fiserv defendants also failed to carry their burden of proof to show that the investment account documents were not forged.

It contains the following relevant conclusions of law:

> 1. The Fiserv defendants have not carried their burden of proof showing that the relevant account documents were not forged.

> 2. The Fiserv defendants have not carried their burden of proof showing that plaintiffs were equitably estopped from claiming their signatures were forged on relevant and indispensable investment account documents, including any Private Equity/Private Debt Investment Authorization forms.

> 3. Plaintiffs have requested rescission of these investment contracts throughout their verified complaint, and therefore equitable estoppel and agency principles do not preclude plaintiffs from objecting to the existence of the investment contracts.

[1] Although a trial court's order denying a motion to compel arbitration is interlocutory, an interlocutory order depriving an appellant of a substantial right which would be lost absent immediate review

will be considered on appeal. *See Raspet v. Buck*, 147 N.C. App. 133, 135, 554 S.E.2d 676, 677 (2001). Because the right to arbitrate a claim is a substantial right, an order denying arbitration is immediately appealable. *See id.*

"[The] trial court's conclusion as to whether a particular dispute is subject to arbitration is a conclusion of law, reviewable *de novo* by the appellate court." *See id.* at 136, 554 S.E.2d at 678. The FAA "is enforceable in both state and federal courts." *Perry v. Thomas*, 482 U.S. 483, 489, 96 L. Ed. 2d 426, 435 (1987). Section 2 of the FAA provides that

> [a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (2006). The parties agree that the IRA contracts in this case are contracts "involving" interstate commerce and that the FAA therefore applies. *See Park v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 159 N.C. App. 120, 122, 582 S.E.2d 375, 378 (2003).

Defendants' motion to compel arbitration "was properly made and considered under [N.C.G.S. § 1-569.7(a)(2)]." *See Blow v. Shaughnessy*, 68 N.C. App. 1, 17, 313 S.E.2d 868, 877 (noting that, "[w]hen not in substantive conflict, state law controls questions of procedure," and that state law of procedure therefore applied to the defendants' motion to compel arbitration), *disc. review denied*, 311 N.C. 751, 321 S.E.2d 127 (1984); *see also Southland Corp. v. Keating*, 465 U.S. 1, 16 n.10, 79 L. Ed. 2d 1, 15 n.10 (1984) ("[W]e do not hold that §§ 3 and 4 of the [FAA] apply to proceedings in state courts. Section 4, for example, provides that the Federal Rules of Civil Procedure apply in proceedings to compel arbitration. The Federal Rules do not apply in such state-court proceedings.").

North Carolina's Revised Uniform Arbitration Act provides that, "[o]n a motion of a person showing an agreement to arbitrate and alleging another person's refusal to arbitrate pursuant to the agreement," "[i]f the refusing party opposes the motion, *the court shall proceed summarily to decide the issue* and order the parties to arbi-

CARTER v. TD AMERITRADE HOLDING CORP.

[218 N.C. App. 222 (2012)]

trate *unless it finds that there is no enforceable agreement to arbitrate.*" N.C. Gen. Stat. § 1-569.7(a)(2) (2011) (emphasis added). "Therefore, when the party contesting arbitration challenges the legitimacy of such an agreement, the trial court must 'summarily determine whether, as a matter of law, a valid arbitration agreement exists.'" *CIT Grp./Sales Fin., Inc. v. Bray,* 141 N.C. App. 542, 544, 539 S.E.2d 690, 691 (2000) (quoting *Routh v. Snap-On Tools Corp.,* 101 N.C. App. 703, 706, 400 S.E.2d 755, 757 (1991), *appeal after remand,* 108 N.C. App. 268, 423 S.E.2d 791 (1992)). "Failure of the court to resolve this issue, when properly raised, is reversible error." *Id.* at 544, 539 S.E.2d at 692.

Thus, the first issue presented to the trial court by defendants' motion to compel arbitration and plaintiffs' response thereto was whether there was an enforceable agreement to arbitrate. In support of their motion to compel arbitration, defendants introduced copies of the IRA contracts and investment authorization forms purportedly bearing plaintiffs' signatures by way of an affidavit attesting that plaintiffs established IRAs "by, among other things, signing a Traditional IRA Application with Stretch Provisions." In response, Dr. Carter attested that his signatures, and those of his wife, were forged on the IRA contracts as well as on the investment authorization forms. In their reply, defendants asserted that,

> on their face, [p]laintiffs' signatures on the IRA applications do not appear to be "scotch taped," as alleged by Mr. Carter in his [a]ffidavit. As the Court can readily determine, . . . [p]laintiffs' signatures on the IRA applications loop over the lines and letters on the document—contrary to an allegation they were "scotch taped."

Defendants also contended that other evidence indicated plaintiffs' signatures had not been forged on the IRA contracts, including evidence that, immediately after receiving documents for plaintiffs' account transfer to Fiserv, Fiserv sent plaintiffs a letter informing them the transfer was complete; that plaintiffs received quarterly account statements from Fiserv throughout the life of their accounts; that specific correspondence referred to the terms of "your current IRA Agreement"; and that the terms of the IRA contract were on the Fiserv website, which defendants' records indicated had been accessed by Mrs. Carter.

Because the evidence in this case does not compel a finding that plaintiffs' signatures were forged on the relevant contracts as contended by plaintiffs, the trial court should have resolved the disputed issue. *See Routh*, 101 N.C. App. at 706, 400 S.E.2d at 757 (remanding where the trial court failed to summarily determine whether a valid arbitration agreement existed). Had the trial court determined that plaintiffs executed the contracts containing the arbitration agreements, it could have then summarily determined that a valid arbitration agreement existed. Had the court determined that the signatures on the documents had not been placed there by plaintiffs, it could have then proceeded to resolve, as it ultimately did, the issues involving defendants' alternative contentions that plaintiffs were nevertheless bound to the arbitration agreements by principles of agency, ratification, or estoppel.

The error, however, does not require remand for a determination of the issue of forgery, because the trial court ruled as a matter of law that plaintiffs neither ratified the investment documents containing the arbitration agreement nor were equitably estopped from asserting that the lack of their signatures precluded enforcement of the arbitration provisions. We review those legal conclusions *de novo*. *See Griggs v. Stoker Serv. Co.*, 229 N.C. 572, 580, 50 S.E.2d 914, 919 (1948) (noting that, where "the facts relating to ratification are in dispute or if reasonable minds might draw different conclusions from the facts, the question of ratification is for the [fact-finder]" (internal quotation marks omitted)); *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 305, 603 S.E.2d 147, 162 (2004) ("With respect to equitable estoppel, if the evidence gives rise to only one inference from undisputed facts, then the doctrine of equitable estoppel is a question [of law].")), *disc. review denied*, 359 N.C. 286, 610 S.E.2d 717 (2005).

> [T]he text of § 2 [of the FAA] provides the touchstone for choosing between state-law principles and the principles of federal common law envisioned by the passage of that statute: An agreement to arbitrate is valid, irrevocable, and enforceable, *as a matter of federal law*, "save upon such grounds as exist at law or in equity for the revocation of any contract."

*Perry*, 482 U.S. at 492 n.9, 96 L. Ed. 2d at 437 n.9 (citation omitted) (quoting 9 U.S.C. § 2). Section 2 does not "purport[] to alter background principles of state contract law regarding the scope of agreements (including the question of who is bound by them)." *Arthur Andersen LLP v. Carlisle*, 556 U.S. ____, ____, 173 L. Ed. 2d 832, 839

(2009). "[S]tate law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." *Perry*, 482 U.S. at 493 n.9, 96 L. Ed. 2d at 437 n.9. "[T]raditional principles of state law allow a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver[,] and estoppel." *Carlisle*, 556 U.S. at ____, 173 L. Ed. 2d at 840 (internal quotation marks omitted).

Defendants contend plaintiffs are bound by the arbitration statements in the IRA contracts because plaintiffs authorized Reinhardt to open the IRAs. They alternatively contend plaintiffs ratified Reinhardt's act of executing the IRA contracts by accepting the tax benefits and administrative services provided by Fiserv ISS and by failing to repudiate the accounts. We agree that, assuming *arguendo* Reinhardt was without authority to bind plaintiffs to arbitration, plaintiffs ratified the unauthorized act.

> In order to establish the act of a principal as a ratification of the unauthorized transactions of an agent, the party claiming ratification must prove (1) that at the time of the act relied upon, the principal had full knowledge of all material facts relative to the unauthorized transaction, and (2) that the principal had signified his assent or his intent to ratify by word or by conduct which was inconsistent with an intent not to ratify.

*Carolina Equip. & Parts Co. v. Anders*, 265 N.C. 393, 400-01, 144 S.E.2d 252, 258 (1965) (citation omitted). Intent to ratify can be evidenced by a "course of conduct on the part of the principal which reasonably tends to show an intention on his part to ratify the agent's unauthorized acts." *Id.* at 401, 144 S.E.2d at 258. Although a principal must have full knowledge of all material facts relative to an unauthorized transaction to ratify the transaction, " 'knowledge . . . can be inferred . . . when [the principal] has such information that a person of ordinary intelligence would infer the existence of the facts in question.' " *Id.* (quoting Restatement (Second), Agency § 91 (1958)). "[T]o constitute ratification as a matter of law, the conduct must be consistent with an intent to affirm the unauthorized act and inconsistent with any other purpose." *Espinosa v. Martin*, 135 N.C. App. 305, 309, 520 S.E.2d 108, 111 (1999) (alteration in original).

Dr. Carter's affidavit states that, "[a]t or about the time our Plan account was taken over by the Fiserv ISS[-r]elated [d]efendants early

in September, 2006, we later learned that certain papers had been prepared to set up such account(s) with the Fiserv ISS[-r]elated [d]efendants." Dr. Carter's affidavit makes repeated reference to his knowledge that, beginning in 2006, Fiserv administered his and his wife's accounts. The affidavit of James Hoy, previously employed with Fiserv ISS, states that, immediately after Fiserv ISS received the transfer-in documents for the account transfer to Fiserv ISS, Fiserv ISS sent letters to both Dr. and Mrs. Carter informing them the transfer was complete and providing full contact information. Over the life of the IRA accounts, Fiserv ISS mailed quarterly account statements to Dr. and Mrs. Carter. A letter Fiserv ISS mailed to Dr. and Mrs. Carter on 31 October 2007 referred to the terms of "your current IRA Agreement." On 27 August 2009, another letter was sent addressing the terms of the IRA contract. Dr. Carter wrote a letter to Reinhardt in December 2008 discussing his and Mrs. Carter's IRAs and mentioning the "recent business merger replacing [plaintiffs'] Fiserv Trust money market savings account with a Trust Industrial Bank savings account." Additional undisputed evidence in the record shows plaintiffs accepted tax benefits and administrative services under the IRA contracts from 2006 until 2010, when they terminated the accounts. Based on these undisputed facts, we hold that plaintiffs had "such information that a person of ordinary intelligence would infer the existence of the facts in question." *See Carolina Equip.*, 265 N.C. at 401, 144 S.E.2d at 258. We further hold the undisputed evidence of plaintiffs' conduct was inconsistent with an intent not to ratify the IRA contracts. *See Espinosa*, 135 N.C. App. at 309, 520 S.E.2d at 111. Accordingly, even assuming plaintiffs never signed the IRA contracts and Reinhardt was not authorized to do so on their behalf, we hold plaintiffs' conduct was "consistent with an intent to affirm the unauthorized act and inconsistent with any other purpose" and that, as a matter of law, plaintiffs ratified any unauthorized act of Reinhardt. *See id.*

**[2]** Defendants also contend plaintiffs are equitably estopped from denying enforceability of the arbitration statement. Again, we agree.

" 'Equitable estoppel precludes a party from asserting rights he otherwise would have had against another when his own conduct renders assertion of those rights contrary to equity.' " *Ellen v. A.C. Schultes of Md., Inc.*, 172 N.C. App. 317, 321, 615 S.E.2d 729, 732 (2005) (quoting *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 417-18 (4th Cir. 2000)), *cert. denied and disc. review denied*, 360 N.C. 575, 635 S.E.2d 430 (2006).

CARTER v. TD AMERITRADE HOLDING CORP.

[218 N.C. App. 222 (2012)]

"In the arbitration context, the doctrine recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him. To allow [a plaintiff] to claim the benefit of the contract and simultaneously avoid its burdens would both disregard equity and contravene the purposes underlying enactment of the [FAA]."

*Id.* (first alteration in original) (quoting *Int'l Paper*, 206 F.3d at 418).

We find *American Bankers Insurance Group v. Long*, 453 F.3d 623 (4th Cir. 2006), relied on by defendants in their brief, persuasive here. In *Long*, the defendant, a nonsignatory to an arbitration agreement, moved to compel the plaintiffs, signatories to the agreement, to arbitrate. *Id.* at 625-26. The district court denied the motion, but the Fourth Circuit reversed on appeal, holding the plaintiffs were equitably estopped from denying applicability of the arbitration clause. *Id.* at 630.

In *Long*, a company had issued the plaintiffs a promissory note, which the plaintiffs later contended was worthless, and the note was incorporated into a subscription agreement containing an arbitration clause. *Id.* at 625. The plaintiffs' complaint alleged the defendant had persuaded the company to offer the worthless note and had structured the note so that the defendant would be in the position of first priority in the event of a default. *Id.* The company filed for bankruptcy, and the plaintiffs filed a complaint against the defendant, alleging several tort claims. *Id.* at 625-26. In reversing the district court's denial of the defendant's motion to compel arbitration on the basis of equitable estoppel, the Fourth Circuit explained that, where "the issue is whether the underlying claims are such that the party asserting them should be estopped from denying the application of the arbitration clause," a court should "examine whether the plaintiff has asserted claims in the underlying suit that, either literally or obliquely, assert a breach of a duty created by the contract containing the arbitration clause." *Id.* at 629. The Court reasoned that "each of the [plaintiffs'] individual claims—interference with contract, securities fraud and negligence, civil conspiracy, unjust enrichment and rescission, and violation of SCUPTA—are dependent upon their allegation that ABIG breached a duty created solely by [the Note]." *Id.* at 630 (second alteration in original) (internal quotation marks omitted). It

further noted that, "although each of the [plaintiffs'] individual claims is phrased in tort, the [plaintiffs] may [not] use artful pleading to avoid arbitration, because, at root, those claims attempt to hold [the defendant] to the terms of [the Note]." *Id.* (third and fifth alterations in original) (internal quotation marks omitted). In its analysis, the Court described and distinguished *R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n*, 384 F.3d 157 (4th Cir. 2004):

> [In *R.J. Griffin*] a builder had entered into a contract containing an arbitration clause with the landowner to build condominiums. After the landowner sold the individual units, the new unit owners complained that the units leaked water, and they sued the builder in state court for negligence and breach of the implied warranty of good workmanship. The builder filed a petition to compel arbitration of the owners' lawsuit, asserting that the owners should be equitably estopped from claiming that the arbitration clause did not apply to them because their state-court claims depended on the existence of the contract containing the arbitration clause. On appeal of the district court's denial of the petition, we rejected this argument, concluding that the owners' underlying suit did not seek a 'direct benefit' from the contract, because their negligence and warranty causes of action were not based on any breach of the contract, but were instead based on duties created by state tort law.

*Id.* at 629-30 (citations and internal quotation marks omitted). The *Long* Court noted, "[t]he [plaintiffs'] underlying complaint is different from the owners' complaint in *R.J. Griffin* in a significant way." *See id.* at 630. "In *R.J. Griffin*, the duties that the builder owed the owners (and allegedly breached by the faulty construction of the condominiums) were created entirely by state tort law; if the builder and landowner had never entered into the building contract, the builder still could have been liable in tort to the owners." *Id.* However, in *Long*, "if [the company] had never issued the Note, the [plaintiffs] would have no basis for recovery against [the defendant]." *See id.*

We have carefully examined plaintiffs' complaint; although their claims are almost entirely "phrased on tort," *see id.*, they are dependent on duties arising from the contracts establishing plaintiffs' IRAs with Fiserv or the investment authorization forms. Plaintiffs' claims are for North Carolina Securities Fraud for acts "[i]n connection with the transactions referred to hereinbefore"; common law fraud, alleg-

ing defendants made false statements and omitted material facts "concerning the fraudulent sale of notes to the plaintiffs"; conversion, alleging defendants directly and indirectly "took monies of the plaintiffs"; breach of contract, alleging defendants "breached their respective investment contracts with the plaintiffs"; breach of fiduciary duty, alleging Fiserv defendants were plaintiffs' "broker-dealers with whom plaintiffs had a special relationship of trust" who, by "[t]he above-described conduct," "breached their fiduciary duties"; gross negligence, alleging Fiserv defendants "had a duty to properly supervise defendant Reinhardt" and that "[t]he failure of these defendants to properly supervise Reinhardt constitutes gross negligence." At the very least, plaintiffs' complaint "obliquely[] assert[s] a breach of a duty created by the contract[s] containing the arbitration clause[s]." *See Long*, 453 F.3d at 629. We further note the losses for which plaintiffs seek relief were sustained under the investment authorization forms and those forms provide the "factual foundation" for each of plaintiffs' claims. *See Ellen*, 172 N.C. App. at 322, 615 S.E.2d at 732.

For the foregoing reasons, the trial court's order is reversed and this case is remanded for entry of an order compelling arbitration.

Reversed and Remanded.

Judges GEER and STROUD concur.